## JARRETT v. HALL.

### No. 4430.

Court of Civil Appeals of Texas. Beaumont.
Oct. 27, 1947.

Rehearing Denied Jan. 7, 1948.

262

Adams & Adams, of Nacogdoches, for appellant.

T. O. Davis and McLeroy & McLeroy, all of Center, for appellee.

WALKER, Justice.

Appellee J. L. Hall brought this action against appellant N. H. Jarrett to recover title to and possession of approximately 91 acres of land, located partly in the L. F. Seegar Survey and partly in the Jesse Courtney Survey, in Shelby County.

Appellee Hall is referred to hereafter as plaintiff, and appellant Jarrett, as defendant.

We shall not attempt to state the details of the pleadings. Plaintiff alleged, upon various grounds, that defendant held the legal title to said land in trust for him, by agreement or by implication of law. His claim, as pleaded, was bottomed upon an agreement by defendant to lend him money with which to purchase the land for himself, allegedly made by defendant before defendant acquired the legal title to the land. Defendant denied the agreement, denied the trust, and plead that he had rightfully acquired full title to the land for his own benefit.

The cause was tried to a jury, and such of the jury's findings as are relevant to the issues made on this appeal are referred to below.

The trial court rendered judgment in plaintiff's behalf against defendant for the title to and possession of the land in suit. The trial court also rendered judgment in defendant's behalf against plaintiff for $1,-588.10, secured by a lien upon the land, and decreed a foreclosure of said lien and ordered the land sold to pay this indebtedness, with execution over against plaintiff for any deficiency. (The sum adjudged against plaintiff presumably consisted of two items, namely, $1,500 as the purchase price of the land, paid out by defendant upon acquiring the legal title to said land, and $88.10 as taxes levied upon the property, also paid by defendant.)

Defendant has appealed from this judgment and has assigned only one point of error for reversal, namely, that for the reasons stated in his motion for an instructed verdict, there was no proof of a trust in plaintiff's behalf, and that the judgment against defendant is therefore not supported by the evidence. Plaintiff says that defendant waived this point. Since we have some inclination to believe that defendant's objections to the charge ought to be construed as a renewal of, and an insistence, upon his motion for instructed verdict, we shall dispose of the point of error upon its merits.

Evidence given in plaintiff's behalf tends to prove the following matters:

(1) On October 8, 1940, G. F. Driskill and wife, who then resided upon the land and who are the common source of title to said land as between plaintiff and defendant, executed and delivered to defendant Jarrett their general warranty deed, purportedly conveying to defendant the fee simple title to the land in suit.

(2) Plaintiff and defendant had been acquainted and had done business with each other during the 9 or 10 years just prior to the date of this deed. Throughout this period the defendant was engaged in purchasing railroad ties, as he was, indeed, at all relevant times thereafter, and plaintiff, from time to time during this period, apparently each year, had cut and sold such ties to defendant. It was plaintiff's practice, sometimes with defendant's financial assistance, to buy small tracts of suitable timber and

to cut this timber into railroad ties which he then sold to defendant.

Perhaps 30 days before the date of Mr. and Mrs. Driskill's deed, plaintiff undertook to buy from Driskill certain timber which he had found upon the land; and Driskill made plaintiff a counter offer to sell plaintiff the land itself, including the timber and improvements, for $1,500. Plaintiff wanted to accept this offer, but he did not have this sum of money and told Driskill so, but he also told Driskill that he thought he could procure the money from a friend, whom he did not name.

Mr. Driskill was not acquainted with the plaintiff before these negotiations occurred.

(3) Defendant was the friend from whom plaintiff hoped to borrow the $1,500. On a Sunday afternoon following this offer from Driskill, plaintiff had a conversation with defendant, near defendant's office in the town of Garrison, respecting his purchase of the land. Plaintiff made a full disclosure of his negotiations with Driskill. He told defendant, in substance, that he could purchase the land from Driskill for $1,500, that he wished to do so, and that he wished to borrow the purchase price from defendant. He also told defendant that there was enough timber on the land to repay such a loan. He knew, of course, that defendant was engaged at this time in buying and selling railroad ties and he expected this information about the timber to appeal to defendant, as in fact it did.

Defendant told plaintiff, in effect, that he would lend plaintiff the money if the timber on the land was sufficiently valuable, but that it would be necessary for him to have the value of the timber appraised. He promised to send some one on the following day to make this appraisal.

It was agreed at this time that if defendant made the loan to plaintiff, defendant would cut and remove the timber and would credit the market price of the timber, current when the timber was cut and removed, as a payment upon the loan. Both plaintiff and defendant expected the loan, if made, to be repaid in full from the proceeds of the timber, but it may be inferred from plaintiff's testimony as a whole that both plaintiff and defendant thought plaintiff was personally obligated to repay the money loaned him by defendant and that the parties did not believe the timber upon the land to be the sole source of defendant's reimbursement. Otherwise there would have been no reason for defendant's agreeing to credit the proceeds of the timber upon the sum paid out by him. And plaintiff testified:

"Q. State whether or not your proposition to (defendant) was for a loan for the $1500.00 with which to pay the purchase price? A. Yes, sir".

We think it is also to be inferred that plaintiff expected the timber to belong to him until defendant cut it.

(In other words, although some details of the agreement were not clearly stated, plaintiff's testimony raised the issue that defendant agreed to lend plaintiff $1,500, that plaintiff agreed to repay this money to defendant, that the timber upon the land was to be the primary source of repayment to defendant but plaintiff was to be obligated to repay to defendant any excess of the debt above the proceeds of the timber, and that plaintiff was to be the owner of any excess of the proceeds of the timber above his indebtedness to defendant).

Plaintiff and defendant did not determine when defendant was to cut the timber, but defendant was not to be paid until the timber was cut. There is some testimony from plaintiff showing that he thought defendant was to be repaid in full whenever defendant cut and removed the timber. Having testified that two and one-half years after October 8, 1940, would have been an average time, and also a reasonable time, for defendant to have cut and removed this timber, he testified as follows on cross examination:

"Q. When was your contract coming to an end? You say two and one-half years? A. I said that was on an average, the way the timber deeds was drawed up.

"Q. If that is on the average, then your contract would mature in two and one-half years after the deed was made, if you are right wouldn't it? A. It would mature when he cut the timber. That is when it was supposed to be paid for".

Since defendant was engaged in the timber business, at least to the extent of buying railroad ties, it may be inferred that the right to acquire plaintiff's timber was of some value to him. It was in evidence that timber was not plentiful at the time of this conversation.

Plaintiff testified on cross examination regarding his paying interest:

"Q. You didn't make any agreement as to what you were to pay him for this money, did you? A. No, there wasn't anything said about it; but he told me there wouldn't be very much interest to pay".

Plaintiff and defendant did not discuss the matter of to whom Driskill was to convey title. It is to be inferred, as pointed out below, that they never did discuss the way and manner in which their agreement was to be executed, nor how it was to be evidenced. Plaintiff said that they did not discuss his making any vendor's lien notes to defendant.

(4) On the following Monday or Tuesday, one day or two days after the aforesaid conversation between plaintiff and defendant, defendant sent an agent to view the land and make the appraisal which he desired, and plaintiff accompanied this agent during his inspection of the property. When this inspection was completed, this agent told plaintiff that he thought defendant would lend plaintiff the money, that there was sufficient timber on the place, that he would report to defendant that night, and that plaintiff might communicate with defendant on the following day.

Plaintiff testified that, in his opinion, there was at least $1,200 worth of pine timber and $300 or $400 of hardwood timber upon the property at this time. He also gave as his opinion that there was enough merchantable timber upon the land at the time of the trial of this cause to repay defendant the $1,500, with legal interest thereon.

Plaintiff telephoned defendant on the succeeding day. He testified:

"Q. What, if anything, did (defendant) say to you with reference to closing the deal? A. Well, he told me—asked me if I could get Mr. Driskill and his wife to meet him at Crawford's store (a place in the town of Timpson) upon and at a certain time and I told him I could. He said we would come over here (referring to the town of Center) and have the deeds made."

Plaintiff construed this conversation with defendant as an expression by defendant of his willingness to lend plaintiff the purchase price of the land, and we think that under the circumstances this was a reasonable construction. After this conversation with defendant, plaintiff communicated with Driskill and accepted Driskill's offer to sell him the land. ("After he told me to meet him at Center, I told Mr. Driskill I would take the place").

(5) On the agreed date (which proves to have been October 8, 1940) the plaintiff, Mr. and Mrs. Driskill and the defendant met in the town of Timpson and proceeded in defendant's automobile to the town of Center. All of the various matters referred to above happened before this meeting.

The parties did not discuss the transaction during the journey to Center.

Driskill was not acquainted with defendant until he met defendant in Timpson on this occasion.

Upon arriving in Center, these four people went to the office of the tax assessor-collector of Shelby County to ascertain what taxes were owing upon the property. Defendant left soon after and was gone for about an hour. Driskill said that before leaving, defendant instructed some person whom the proof does not identify to prepare a deed to him from the Driskills. Plaintiff said that he brought this deed with him upon his return. At any rate, upon defendant's return to the office of the assessor-collector, defendant made available for execution a form of deed from Mr. and Mrs. Driskill, conveying the property to the defendant. Mr. Driskill read this document; and then he and his wife executed, acknowledged and delivered it to the defendant. This is the deed of October 8, 1940 referred to above in paragraph 1.

At this time, defendant paid the taxes which had accrued upon the property, and paid over to Mr. Driskill the balance of the purchase price, namely, $1,225.

This entire transaction in the office of the assessor-collector occurred in the presence of the plaintiff, and with his knowledge, and plaintiff knew before the Driskills executed their deed that the defendant was named as grantee in said deed. Until plaintiff and Driskill learned that defendant was named as grantee in this deed, both plaintiff and Driskill had supposed that conveyance of title would be made directly to the plaintiff, and the plaintiff said that he did not consent to defendant's taking title in his own name. He testified under examination by his own counsel:

"Q. Did you agree for the deed to be made in defendant's name? A. No, sir.

"Q. Did you consent to it? A. No, sir. I didn't know anything about it." Nevertheless, plaintiff made no objection, nor did he, in the assessor's office, make any inquiry of the defendant respecting the deed or the transaction between them. He sat mute, and thus acquiesced in defendant's taking title to the land in his own name. The testimony we have just quoted probably ought to be construed as only showing that plaintiff had never formally agreed with defendant that title could be conveyed to defendant.

Defendant said nothing and did nothing in the assessor's office to indicate that he had repudiated his agreement with plaintiff unless that repudiation is to be inferred from the fact that he caused himself, instead of plaintiff, to be named as grantee in the deed. The significance of this act was only referred to in the assessor's office by Mr. Driskill and the previous transactions between the parties were not discussed.

The form given this deed did raise some question in Mr. Driskill's mind. Plaintiff testified:

"Q. Was there anything said by Mr. Driskill in (defendant's) presence with reference to the manner and form of the deed? A. Well, he said he thought I would—asked me where I was coming in at on it. He said he thought I was buying the place". He then testified that this remark was made in defendant's presence, but said nothing further about the matter.

Mr. Driskill himself testified to a similar remark made by him out of defendant's presence, while defendant was out of the assessor's office, but the trial court excluded this testimony and also excluded Driskill's testimony of plaintiff's reply. Consequently, on this record, there is nothing before us except the statement of Driskill to which plaintiff testified, without any evidence that either plaintiff or defendant said anything in response.

(6) Defendant's causing title to be conveyed to him instead of to plaintiff did not violate any phase of the agreement which he and plaintiff had made. Since plaintiff said that he and defendant, while in the assessor's office, did not discuss the manner in which the transaction between them should be handled, and since this matter was not discussed during the original Sunday afternoon conversation between plaintiff and defendant nor during the journey from Timpson to Center, it is apparent that the matter was never discussed by plaintiff and defendant, and that plaintiff and defendant never agreed upon how the agreement between them should be executed or memorialized.

Plaintiff's mute acquiescence in defendant's conduct can be explained by his previous relationship with defendant and by various transactions he had had with defendant during the 9 or 10 years he had known defendant before October 8, 1940. Plaintiff's testimony raised the issue that there was a confidential relationship between him and defendant in which defendant had customarily assumed the dominant role.

It appears from plaintiff's testimony that on October 8, 1940 plaintiff was about 47 years old. He was a man of little formal education. He said: "I didn't have much. I was in about the sixth grade". He was a farmer and for many years he had also been engaged in buying and selling railroad ties. He was obviously a man of little means, and he apparently relied primarily upon his own physical labor to provide a livelihood for himself and his family.

Plaintiff and defendant had had many business transactions together before they

disagreed over the transaction involved in this case, but their previous association had been harmonious. It was in evidence that plaintiff had extended trust and confidence to defendant and that defendant had extended trust and confidence to plaintiff.

On several occasions defendant had lent plaintiff money with which to buy small tracts of timber to be cut by plaintiff into railroad ties and sold to defendant; and he and defendant had customarily dealt with these transactions in an informal manner. Plaintiff testified that he had not given defendant a note, but defendant had simply lent him the money, that sometimes the timber deed or contract was made to plaintiff and sometimes to defendant, and that defendant had reimbursed himself out of a percentage of what he paid plaintiff for the ties. All of these loans were small, the largest being for $350. Plaintiff said that the deed to the timber purchased with this $350 was made to him. Plaintiff had borrowed money from defendant with which to make a crop, but he said he gave defendant his promissory note on this occasion.

Plaintiff also testified, in substance, that the defendant had controlled these various transactions. He testified:

"Q. I'll ask you whether or not (defendant) transacted most of the business? A. Yes.

"Q. That is, did most of the figuring? A. Yes.

"Q. And exercised his judgment in making the decisions about your business dealings? A. Yes, sir."

Plaintiff said that he trusted defendant in telling defendant about his negotiations with Driskill, and he also testified, in substance, that he trusted defendant to abide by his agreement despite defendant's taking title to the land in his own name.

(7) After the deed was delivered and the purchase price was paid, plaintiff, defendant and Mr. and Mrs. Driskill returned to Timpson in defendant's automobile, and as they were on the point of separating in Timpson, plaintiff had a conversation with defendant respecting the transaction between them which the trial court instructed the jury, at the close of the trial, not to consider.

There is testimony that the parties did not discuss the transaction until they arrived in Timpson.

Mr. and Mrs. Driskill continued to reside upon the property until the latter part of December, 1940, when they moved away. Mr. Driskill notified plaintiff when they left, and plaintiff at once took up residence on the property with his family, and he has continued to reside there since that time.

(8) The parties' conduct from October 8, 1940, until December 23, 1944, indicates that they regarded plaintiff as the owner of the property.

Plaintiff testified as follows regarding his understanding of the relationship between himself and defendant:

"Q. After the deed was made what was your understanding about it? A. Well, he was to make me the deed when the land was paid for. And the timber was to be cut off of the land and applied on the land." (This testimony went into the record without objection. The understanding to which the plaintiff testified need not to have been founded upon the conversation at Timpson which the trial court excluded, and for that reason we cannot say that the trial court's instruction to the jury excluded the evidence just quoted. This testimony, at least when read with that preceding it, may be construed as referring to the common understanding of plaintiff and defendant, and since it is a circumstance tending to prove defendant's intent, or what he wanted plaintiff to believe was his intent, in having title conveyed to him, we see no reason why it is incompetent. Plaintiff's testimony of his understanding does not prove an agreement made after the Driskill deed was delivered; it tends to show, instead, that defendant took title to himself intending all the while to perform his promise to the plaintiff).

Plaintiff testified that he did not ask defendant's consent to occupy the land, and the jury could infer that he took up residence on the land as of right.

Plaintiff testified that during his occupancy he had added a 30 foot shed to the barn and had put a new roof on the house. (This barn and this house are the only improvements referred to in the testimony).

He also said that he had maintained the fences, although he seems to have done nothing here beyond putting in a few new posts. All of these improvements were made at the plaintiff's expense.

Plaintiff has farmed the land each year, but has never paid defendant any rent nor did defendant request the payment of any rent prior to December 23, 1944. Plaintiff received certain payments from the United States government, referred to as "parity payments", made to him by the "Triple A.", which apparently bore some relation to his cultivation of the land, and he said that he had appropriated these monies, paying none of them to the defendant.

On two or three occasions, each time with defendant's authority, plaintiff cut some of the timber and sold the product to defendant, who paid him the full price without any deductions. The quantity of timber involved was small, and plaintiff's motive, at least on two occasions, was to prevent the loss of trees which had died. When asked why defendant paid him for this timber, plaintiff said the amount was small and defendant did not require it.

However, defendant paid the taxes levied upon the land and plaintiff has not reimbursed him. He did testify that defendant mentioned the payment of taxes to him, possibly in 1943, and he said that he told defendant he was willing to pay them. The evidence does not show to whom the property was assessed.

Of all these various matters, defendant at least knew that plaintiff was occupying the land, without having procured his consent, using the land as he wished. Such conduct of the parties was referred to by the Supreme Court of Pennsylvania in Gates v. Keichline, 282 Pa. 584, 128 A. 490, as a circumstance affording support for a jury verdict establishing a trust, the circumstances before that court being described as follows, 128 A. page 492: "Moreover, a number of witnesses testified that Sarah Gardner lived on the premises in controversy from the time of the sheriff's sale until the date of her death, and farmed it for several of those years; that, when it was rented, she received the landlord's share of the crops and continued to occupy part of the property; that, from two years after the sheriff's sale, until the time of her death, the property was assessed for taxation in her name, finally and comprehensively; that during all this time, she and the others concerned, including defendant, always treated the property as belonging to her."

(9) Plaintiff and defendant maintained a harmonious relationship for over four years after the Driskill deed, namely, until December 23, 1944, and plaintiff said that he continued throughout this period to cut and sell railroad ties to defendant. These ties were produced from other land than that involved in this suit.

Two or three times during this period plaintiff spoke to defendant about defendant's cutting the timber upon the land. He was apparently suggesting to defendant that defendant proceed with the cutting of the timber, but the defendant always put him off. Plaintiff said: "I asked him (referring to defendant) several times about cutting it. He said he wasn't ready to cut it; that the timber was drawing me money and I just didn't know it. That the timber in a few years—

"Q. All during that time did (defendant) continue to stay in the timber business? A. Yes, sir.

"Q. Tie business? A. Yes, sir.

"Q. How many times do you recall that you mentioned that fact to (defendant)? A. I don't know exactly, two or three times".

Prior to December 23, 1944, defendant did nothing to indicate to plaintiff that he claimed to be the owner of the land, and plaintiff referred to one occasion when defendant recognized the existence of the loan. Plaintiff said: "I was in his office one day, and when me and him was getting along just fine, he asked me how much reckon I owed him. I said 'I don't know; right smart'. He said $1,800.00. And I had borrowed $300 to buy a small tract of timber.

"Q. Another tract of timber? A. Yes, sir."

(10) On December 23, 1944, plaintiff again mentioned cutting the timber to defendant, and during this conversation de-

268

fendant repudiated plaintiff's claim to the land for the first time since delivery of the Driskill deed. Plaintiff testified:

"Q.—When—was the last conversation you had with (defendant) with reference to cutting and removing the timber? A. It was December, '44; 23rd—.

"Q. And what was said between you there? A. Well, I asked him about it and he said that I hadn't paid any on the place; that I would have to rent it if I stayed there.

"Q. Had he ever before that said anything to you or made any expression that lead you to believe that he was claiming the land, other than the timber as security for the advancement? A. No, sir.

"Q. Then was that the first indication that you had that he was claiming the land? A. Yes, sir."

(11) Plaintiff brought this suit very shortly after December 23, 1944. The original petition is not in the transcript, but the amended petition, on which the case was tried, was filed on March 26, 1945, about three months after defendant repudiated the trust.

(12) Defendant never paid plaintiff anything which might be regarded as consideration for his services in bringing defendant and Driskill together and in assisting him to procure title from Driskill.

(13) All of the transactions referred to above were in parol, excepting only the conveyance to defendant from Mr. and Mrs. Driskill.

The statement just made represents plaintiff's theory of the facts and constitutes plaintiff's only proof of title to the land. Under the point of error before us, we are not required to state defendant's theory of the facts, but we will do so in fairness to the defendant. Defendant said, in effect, that plaintiff acted only as his friend; that plaintiff testified; that he bought the land he did not make the agreement to which for himself; that a short time after the deed was delivered, plaintiff told him that he had to have a place to live and requested permission to reside upon the land; that he granted plaintiff permission so to do, plaintiff agreeing to keep up the property; and that on December 23, 1944, on his own initiative, he finally told plaintiff that plaintiff would have to pay him rent in the future because "I got tired of furnishing him a place to live over there."

Defendant says that the testimony offered in plaintiff's behalf does not show a trust and thus does not support the judgment; (a) because it does not show that an enforcible agreement between plaintiff and defendant was in existence when title was conveyed to defendant; (b) because it does not show that plaintiff paid any part of the purchase price, and (c) because the quantum of proof was insufficient.

■ Defendant's point of error is overruled upon the following grounds:

(a) The testimony adduced in plaintiff's behalf shows an agreement between plaintiff and defendant made prior to the Driskill deed, that defendant would lend plaintiff the purchase price of the land, to wit, $1,500, and that plaintiff would repay this money to defendant. The time of repayment, namely, when defendant cut and removed the timber, was sufficiently definite and certain. If we err in thinking that there is any evidence to show that any excess of the debt above the proceeds of the timber was to be repaid when the timber was cut and removed, then the payment of that excess would at least be due upon defendant's demand, made after the timber had been cut and removed, and the time of payment would be sufficiently definite. Lucia v. Adams, 36 Tex.Civ.App. 454, 82 S.W. 335.

■ Had the parties memorialized their agreement completely and in accordance with law, there would have been a consideration for defendant's promise, if any be required, namely, the timber on the land. Plaintiff, in substance, agreed to sell this property to defendant in consideration of defendant's promise to cut and remove it and to credit the proceeds upon plaintiff's debt. As has been shown, this timber was valuable to the defendant. He was in the railroad tie business when he made the agreement with plaintiff, as he seems to have been for several years before and as he has been since, and there was evidence from plaintiff that timber was not plentiful when the agreement was made. The rea-

son defendant gave plaintiff for persistently delaying the cutting of the timber shows that he thought the timber was increasing in value. Defendant was willing to make the loan to plaintiff on security of the timber. Further, there is authority under which defendant could have charged plaintiff legal interest upon the loan. Plaintiff gave some testimony indicating that defendant expected to charge him interest and that he expected to pay it, and in the absence of an agreement fixing the interest rate, the legal rate would be applicable under Lucia v. Adams, 36 Tex.Civ.App. 454, 82 S.W. 335, page 336.

■ Despite the implications which may be made for the purpose of defining the obligations of the parties, the contract between plaintiff and defendant was obviously incomplete because plaintiff and defendant did not determine how it was to be carried out, nor how it was to be evidenced, yet both plaintiff and defendant knew that at least one writing, namely, a deed from Mr. and Mrs. Driskill, would have to be executed. Plaintiff said that he thought title was to be conveyed to him, and his assumption was reasonable, but defendant never told him so. Defendant's conduct, if it indicates anything at all, tends to show that defendant expected title to be made to him. However, the most significant omission was the failure to settle upon how the defendant's security was to be evidenced, and both plaintiff and defendant intended defendant's loan to be secured.

There is a complete absence of evidence that plaintiff and defendant intended not to further define their obligations and intended not to reduce their agreement to writing; and since they knew that at least one instrument would have to be executed, an assumption that they expected or the Statute of Conveyances, Vernon's assumption that they intended a contract which might violate the Statute of Frauds, of the Statute of Conveyances, Vernon's Ann.Civ.St. arts. 3995, 1288. We therefore think the evidence summarized above must be construed as showing no more than a preliminary agreement upon various phases of a contract which was to be further defined and was to assume a form to be agreed upon later, and that, for this reason, this preliminary agreement was not an enforcible contract. Consequently, we assume that either plaintiff or defendant could have rescinded the agreement at any time prior to the delivery of the Driskill deed.

■ (b) However, defendant's power to rescind this agreement does not settle the question of defendant's liability to plaintiff unless it was exercised effectually.

For plaintiff and defendant had the power to consummate and to memorialize their agreement as they wished. If defendant had paid the purchase price to Driskill in the assessor's office, intending to perform his promise, and if he had taken title from Driskill with plaintiff's knowledge and acquiescence (as he did take title), expecting to convey title to plaintiff when repaid, he would have actually made the loan to plaintiff, the money paid over by him to Driskill would have belonged to plaintiff, and the title conveyed to him would have been charged with a trust in favor of plaintiff, either resulting or express, at least if plaintiff thought that he was doing these very things, as plaintiff testified, in effect, to believing. Such a trust was enforcible. Bailey v. Harris, 19 Tex. 108, 109; Hirshfeld v. Howard, Tex. Civ.App., 59 S.W. 55, 60 S.W. 806; Lucia v. Adams, 36 Tex.Civ.App. 454, 82 S.W. 335; Salter v. Gentry, 61 Tex.Civ.App. 526, 130 S.W. 627; Redeker v. Redeker, Tex.Civ.App., 292 S.W. 572; Burns v. Ross, 71 Tex. 516, 9 S.W. 468; Pearce v. Dyess, 45 Tex.Civ.App. 406, 101 S.W. 549; Restatement of Trusts, Sec. 448. Defendant would have performed his promise and would have memorialized the agreement at the very time that title would have been conveyed to him. Some of the authorities cited above show that defendant would have been protected against any effort of plaintiff to escape payment of the indebtedness.

■ (c) We hold further that in order for defendant's power of rescission to be of any effect here, defendant must not only have taken title to the land intending secretly to hold the land for himself. Defendant must also have expressed this intention to rescind by conduct which

would give plaintiff notice that he intended to rescind his agreement and was acting independently, for his own benefit. Otherwise, if plaintiff trusted defendant to abide by his agreement (as he says he did) defendant would perpetrate a fraud upon the plaintiff. Defendant would, of course, perpetrate a fraud upon any person with whom he had made such an agreement unless he gave notice to such person that he had rescinded his agreement; but the confidential relationship between plaintiff and defendant would materially aid the defendant in accomplishing such a fraud in this case and it distinguishes this case from others, if any distinction must be made.

We are inclined to think there was no fiduciary relationship between plaintiff and defendant (despite the jury's finding to the contrary), but at all relevant times there was at least a confidential relationship between them founded upon 9 or 10 years of harmonious dealing together, during which both parties were accustomed to extend confidence and trust to each other in their mutual business. It is in evidence that defendant was the dominant member in their association, that his judgment controlled and that plaintiff was accustomed to abiding by defendant's exercise of judgment in their joint affairs.

Consequently, unless the defendant put plaintiff on notice of his intention to rescind the agreement, plaintiff could rightfully assume that defendant would comply with his promise; and his trust in defendant, rightfully placed in defendant, would effectually prevent him from protecting himself and would result in depriving him of something which was of value to him, namely, Driskill's promise to sell him the land. If defendant had openly announced in the assessor's office when he tendered Driskill the deed for execution that he was purchasing the property for himself, Driskill might have refused to sell the property until his intended grantee, plaintiff, had had an opportunity of procuring funds elsewhere. The enforcibility of Driskill's promise, and plaintiff's right, or not, to maintain an action for damages against defendant had defendant induced Driskill to repudiate his agreement with plaintiff

are without significance here; and the case involves more than misuse of information imparted in confidence. Plaintiff's confidential relationship with defendant entitled him to have defendant act openly, if there was nothing else in the case to require defendant to do that.

■ (d) It remains to be determined whether the agreement between plaintiff and defendant was rescinded by the defendant before he took delivery of the Driskill deed, and if this rescission was made, whether plaintiff had notice thereof or whether he rightly relied upon defendant to comply with his promise.

The only act of defendant from which it might be inferred that he, in fact, rescinded his agreement was his causing title to be made to him instead of to plaintiff, and this act, under the circumstances of this case, was ambiguous. For defendant might well have decided to take title as security for the performance of plaintiff's promise. Consequently, we have had some difficulty in perceiving any basis for concluding that defendant did rescind his agreement before he took delivery of the Driskill deed or that he did not intend to comply with his promise to plaintiff, especially when the defendant's conduct during the four years after that deed is considered. However, the jury has found that defendant took title in breach of faith and with the intention of violating his agreement with plaintiff, and have thus closed this inquiry. We do not understand that defendant's point of error attacks these findings and under our theory of the case there is, of course, no reason why the defendant should do so.

However, when we consider the confidential relationship between plaintiff and defendant, it cannot be said as a matter of law that defendant put plaintiff on notice that he was acting for himself and had rescinded the agreement.

As stated, defendant's act in causing the deed to be made to him instead of to plaintiff was his only act tending to give plaintiff any notice of the aforesaid rescission, and this could have meant the taking of title as security. Was plaintiff bound to

ask, then and there in the assessor's office, what the defendant intended? Plaintiff and defendant had not determined how their agreement was to be evidenced or put into effect, and when we consider: (a) this fact, and when we also consider: (b) the informal manner in which plaintiff and defendant had customarily handled their business, including other transactions involving the acquisition of title to interests in land, (c) the dominant position of the defendant when the deed was made and throughout the previous relations of the parties, (d) the confidential relationship between defendant and plaintiff and the mutual practice these people had of extending confidence to each other, (e) and plaintiff's lack of formal education, there is some basis for saying that plaintiff's reliance upon defendant's promise was reasonable and was not negligent. Why should not defendant perform his promise? There is evidence that plaintiff and defendant had always performed their mutual promises, and the plaintiff's description of the parties' conduct from October 8, 1940, until December 23, 1944, indicates that plaintiff's understanding of his rights was correct.

There is evidence that plaintiff did rely, and rightly relied, upon defendant to abide by his agreement despite the form of the Driskill deed, and the jury have found in general terms under Issue 4 that plaintiff relied upon defendant's promise to "advance him the purchase money for the land in question".

Driskill's remark to the plaintiff in the assessor's office is not controlling on the question of notice, because of the confidential relationship existing between plaintiff and defendant. Driskill was surprised at the form of deed, and he expressed his surprise to the plaintiff, but Driskill did not become acquainted with the plaintiff until plaintiff attempted to buy his timber, and he did not become acquainted with defendant until he met defendant in Timpson on October 8, 1940, to complete the sale of his property. Driskill did not know the relationship between the parties nor the facts which controlled the plaintiff's judgment and his remark added nothing to the notice plaintiff already had from defendant's conduct.

(f) Since there is evidence that defendant did not give plaintiff notice that he had rescinded his agreement and was buying the land for himself, and since there is evidence that plaintiff rightfully assumed that defendant was performing his promise, defendant's act in paying out the purchase price may be given exactly the same legal effect as if defendant had not rescinded the agreement but had, instead, performed it. His payment thus enures, in contemplation of law, to plaintiff's benefit.

Defendant's acquisition of title must therefore be charged with a trust in plaintiff's favor. Since our conclusion is not founded upon defendant's performance of his promise, but is founded upon the necessity of protecting plaintiff against a fraud which would otherwise be perpetrated upon him by the defendant, this trust is a constructive trust.

(g) Our conclusion does not violate the Statute of Frauds or Statute of Conveyances. By implication of law we have given precisely the same effect to defendant's conduct as if he had intended to perform his contract and had actually taken title as security and as the authorities cited above show, such conduct would create an enforcible trust. Since the agreement was not completed before title was conveyed to defendant, it cannot be said that this agreement violated either the Statute of Frauds or the Statute of Conveyances. If the parties had agreed that title should be made to plaintiff (as plaintiff expected title to be made), the agreement shown above, without more, might have violated the Statute of Frauds; but if they had agreed that defendant would take title as security, an enforcible trust would have been created under authorities hereinbefore cited.

The defendant has cited cases referring to the necessity of an enforcible agreement being in existence when title was conveyed. These cases are not in point, because defendant, as between himself and plaintiff (at least in contemplation of law) completed and memorialized his contract at the very time title was conveyed to him. The

acquisition of title, the completion and memorialization of the contract occurred at one and the same moment. The situation is therefore distinguishable from authorities cited by defendant.

Furthermore, in connection with both matters just referred to, the evidence stated above shows that defendant is primarily responsible for the absence of a complete written expression of the parties' agreement. It is primarily defendant's fault that the agreement was not completed, was not memorialized in permanent written form, and that there was not in existence at the time he took his deed from the Driskills an enforcible contract. Such a contract would have obviated any question of the Statute of Frauds, the Statute of Conveyances, or the absence of a consideration for defendant's promise. Defendant's arguments are founded upon his own assumption of control over the transaction in the assessor's office and under the circumstances related by plaintiff, defendant's insistence upon what are nothing but consequences of his own conduct only aggravate the fraud which would be perpetrated upon the plaintiff if we denied the existence of a constructive trust.

The judgment of the trial court is accordingly affirmed.

## On Motion for Rehearing.

Defendant's motion for re-hearing has been considered. Defendant's argument is founded upon decisions involving resulting trusts, while the relevant evidence before us shows something different, namely, a constructive trust. The possibilities referred to by defendant would prevent even the establishment of some resulting trusts. Perhaps at the bottom of this litigation is the question of whether plaintiff has any interest which ought to be protected, and we think he has—at least against the abuse of a confidential relationship.

The motion for re-hearing is overruled.